In re FORKLIFT LP CORPORATION f/k/a Clark Material Handling Company, et al., Debtors.

Forklift LP Corporation f/k/a Clark Material Handling Company, et al., Plaintiffs,

v.

iS3C, Inc., f/k/a iS3C Consultancy Services Limited, Defendant.

Bankruptcy No. 00–1730(KJC). Adversary No. 03–56113(PJW).

United States Bankruptcy Court, D. Delaware.

March 21, 2007.

389

Joseph Grey, John C. Kilgannon, Stevens & Lee, P.C., Wilmington, DE, for Defendant.

Ian Connor Bifferato, Garvan F. McDaniel, Bifferato Gentilotti LLC, Wilmington, DE, for Forklift Liquidating Trust.

**MEMORANDUM OPINION**

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to the motion (Adv. Doc. # 38) of iS3C Consultancy Services Ltd. ("Defendant") for partial summary judgment against Forklift Liquidating Trust ("Plaintiff"). Plaintiff, the successor trust for Clark Material Handling Company and its affiliated debtors (collectively, the "Debtors"), seeks to disgorge payments made to Defendant and to disallow Defendant's claim against the Debtors.

**BACKGROUND**

The Debtors filed for bankruptcy on April 17, 2000 pursuant to chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 101 et seq.[1] On August 3, 2001, the Debtors applied for an order authorizing the retention of Defendant as a computer consultant to aid in the implementation of a software upgrade. (Doc. # 905.) The Court approved a contract between Defendant and the Debtors on September 7, 2001, which budgeted fees totaling approximately $450,000 to be paid to Defendant. (Doc. # 936.)

The contract between Defendant and the Debtors set forth several milestones to be achieved. (Doc. # 905, att. 2.) Defendant ceased work before all of the milestones were achieved and the parties disagree as to which party was to blame for the failed software upgrade. Plaintiff claims that the Debtors already paid approximately $458,000 to Defendant for its services, (Adv. Doc. # 40, p. 6) while Defendant claims that it has only received $270,000. (Adv. Doc. # 38, p. 6.) On April 7, 2003, Defendant filed an administrative claim for $458,470.08 for services provided under the base contract and additional services that the Debtors requested. (Doc. # 2483, Ex.

D.) The Debtors objected to Defendant's claim on September 23, 2003 in their Eighth Omnibus Objection to Claims (the "Objection"). (Id. at ¶¶ 31–32.) In addition, the Debtors filed this adversary proceeding on September 24, 2003 seeking to disgorge the payments already made to Defendant. (Doc. # 2486.) As this adversary proceeding and the Debtors' Objection involve the same ultimate issues, the parties agreed to consolidate the Objection into this adversary proceeding. (Adv. Doc. # 38, pp. 1–2.)

The hearing on the Debtors' Objection was scheduled for October 22, 2003. (Doc. # 2483, p. 1.) Although counsel for the Debtors stated in the agenda for the hearing that they were ready to go forward with their Objection, (Doc. # 2597) at the hearing the Debtors requested that the Court delay hearing the merits of Defendant's claim until the Debtors had a chance to take discovery on factual issues. (Oct. 22, 2003 Hearing Transcript, Adv. Doc. # 40, Ex. E, p. 57, line 17—p. 59, line 3.) Defendant attended the hearing with a witness, ready to address the Objection on the merits. (Id. at p. 56, lines 15–16.) However, the Court determined that it did not have time and adjourned the hearing on the Objection until a later, unspecified date. (Id. at p. 89, lines 6–12; see also Id. at p. 133, lines 4–14.) At the October 22, 2003 hearing, after counsel for the Debtors assured the Court that the Plan provided means to pay Defendant's claim in full if it were allowed at a later date, (Id. at p. 91, line 21—p. 92 line 11), the Court went forward to confirm the Debtors' Third Amended Plan of Liquidation (the "Plan"). (Doc. # 2601.)

The Plan provided that it would not become effective (the "Effective Date") until a number of conditions were satisfied.

1. Individual sections of the Bankruptcy Code will be cited herein as "§ ___".

(*Id.* at § 2.59.) Those conditions were not completed until August 18, 2004—10 months after the Plan was confirmed. Shortly after the Effective Date, the Trustee effected an "Initial Distribution" which is defined in the Plan to mean

> payment to a Holder of (a) an Allowed Secured Claim that is not agreed to deferred payments, (b) an Allowed Administrative Claim that has not agreed to deferred payments, (c) a Priority Non–Tax Claim that has not agreed to deferred payments, and (d) Professional Claims.

(*Id.* at § 2.88.)

The Plan outlined a program of deferred distributions to several types of creditors. The deferred distributions were to be funded through the prosecution of numerous avoidance actions filed by the Debtors. (*See* Doc. # 2601.) In the interest of avoiding administrative insolvency and conversion of the case to chapter 7, (Adv. Doc. # 38, p. 7.), some of the administrative claim holders, but not Defendant, agreed before the Plan was confirmed to receive this deferred distribution from the proceeds of the avoidance actions. By agreeing to this treatment, these administrative claim holders waived their right under § 1129(a)(9)(A) to receive full payment on the Effective Date of the Plan. The Plan refers to the claims of these claim holders as "Allowed Deferred Claims." Section 2.7 of the Plan defines "Allowed Deferred Claim" in a manner that allows for two types of claims:

> "Allowed Deferred Claim" means any Claim, including an Administrative Claim, ... that either by agreement *or* because it was Allowed subsequent to the Effective Date will be paid on a deferred basis as part of the Subsequent Distributions ...

(Doc. # 2601, § 2.7 (emphasis added).) The term "Subsequent Distributions" is defined as "the Distributions made under the Phase I Distributions, Phase II Distributions, and Phase III Distributions." (*Id.* at § 2.140.) In another section addressing claims that become allowed at a later date, the Plan again provides for distributions through Phase I, II and III Distributions:

> To the extent that a Disputed Claim becomes an Allowed Claim after the Initial Distribution Date, the Trustee shall pay such Allowed Claim, without interest, pursuant to either the Phase I Distributions, Phase II Distributions or Phase III Distributions, whichever is applicable.

(*Id.* at § 6.12.)

The definitions for the Phase I, II and III Distributions describe a process whereby money collected from avoidance actions is dispersed among three groups of creditors: (1) "Holders of Allowed Deferred Claims that have agreed to a deferred Distribution," (2) a group of Korean Banks who hold by far the largest administrative claims against the Debtors, and (3) holders of a certain type of general unsecured claim. (*Id.* at §§ 2.110, 2.111, 2.112.) The Plan provides that Phase I Distributions will commence at a date to be determined by Plaintiff. (*Id.* at § 2.110.) As of this date, almost three and a half years after the Plan was confirmed, Plaintiff has not yet effected a Phase I Distribution, and, according to Plaintiff's counsel, no distributions subsequent thereto are anticipated.

Before the Effective Date of the Plan, the Debtors reached settlements with all other administrative claim holders who had not agreed to the deferred distribution program. (Adv. Doc. # 40, p. 12.) If Defendant has a valid administrative claim—which Plaintiff disputes—then, as Plaintiff's counsel advised at oral argument, Defendant is the only administrative claim holder that did not either agree to de-

ferred payment or a settlement with the Debtors before the Plan became effective.

Pursuant to a scheduling order that the parties agreed to, the current motion only addresses whether Defendant's claim should be treated under the deferred distribution program outlined in the Plan, to the extent that it becomes allowed in whole or in part. Defendant argues that the Plan provides for payment of its claim in full, while Plaintiff argues that payment should occur through the deferred distribution program, which, according to Plaintiff's counsel's representation at oral argument, would give Defendant an estimated recovery of about 10% of the value of its claim. At this stage, the parties do not address whether Defendant's claim should be allowed, or even whether Defendant has a cognizable claim at all. Thus, the issue here is, if Defendant's claim becomes an allowed claim, is it payable in full as an allowed administrative claim or is it subject to the deferred distribution program with an estimated dividend of 10%?

**2.** The Plan gives the following definition for the term "Administrative Claim":

"Administrative Claim" means a Claim for any cost or expense of administration (including, without limitation, Professional Claims) of these Chapter 11 Cases, and which is made under Sections 503, 507(a)(1), or 507(b) of the Bankruptcy Code including, but not limited to, (a) any actual and necessary post-petition cost or expense of preserving the Debtors' Estates or operating the Debtors' businesses, (b) any payment to be made under the Plan to cure a default on an assumed executory contract or assumed unexpired lease, (c) any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their business including, but not limited to, wages, salaries or commissions for services rendered after the commencement of these Chapter 11 Cases, (d) compensation or reimbursement of expenses of Professionals to the extent Allowed by the

## DISCUSSION

Defendant seeks partial summary judgment in this case pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (applicable here pursuant to Bankruptcy Rule 7056). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding motions for summary judgment, a court must view all facts in the light most favorable to the non-moving party. *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.,* 343 F.3d 669, 680 (3d Cir.2003).

A material issue of fact exists as to which party was to blame for the failed software upgrade. Plaintiff argues that Defendant does not have an administrative claim under the provisions of the Plan[2] because Defendant provided no benefit to the estate. While this is clearly an issue that needs to be resolved, it is outside of

Court under Section 330 or Section 331 or the Bankruptcy Code, and (e) any fee or charge assessed against the Estates under Section 1930 of Title 28 of the United States Code.

(Doc. # 2601, § 2.2.) At this stage of the case it is impossible to determine whether Defendant's claim fits under this definition. In order to fit the claim under clause (a), Defendant would have to show that it provided services that were "actual and necessary." The same showing is required for clause (d) because court approval of professional services fees under § 330 is only granted for services that are actual and necessary. § 330(a)(1)(B). Resolution of this issue requires inquiry into the merits of Defendant's claim, which are not under consideration in this motion. I assume that Defendant's services were actual and necessary so that I may reach the question of how the Plan will treat Defendant's claim to the extent that it is allowed.

the scope that the parties themselves chose to impose on this opinion. (*See* Adv. Doc. # 40, p. 2.) As the parties have agreed to table the material issues of fact, the decision here hinges on whether the Court accepts Plaintiff or Defendant's interpretation of the Plan, or whether there is some other means of resolving this dispute as a matter of law.

## I. Plan Interpretation

Plaintiff argues that Defendant's claim, to the extent that it becomes allowed in whole or in part, should be classified as an "Allowed Deferred Claim" under section 2.7 of the Plan because it will be "Allowed subsequent to the Effective Date." (Doc. # 2601, § 2.7.) As an Allowed Deferred Claim, Plaintiff argues that it should be paid "on a deferred basis as part of the Subsequent Distributions," (*Id.*) or in other words, through the Phase I, II or III Distributions. (*Id.* at § 2.140.) Plaintiff argues that its interpretation is further supported by section 6.12 of the Plan because Defendant's claim will become allowed, if at all, "after to the Initial Distribution Date," which, according to Plaintiff, occurred long ago. (*Id.* at § 6.12.) Therefore, pursuant to section 6.12, Plaintiff argues that Defendant's claim should be paid "without interest, pursuant to either the Phase I Distributions, Phase II Distributions or Phase III Distributions, whichever is applicable." (*Id.*) Plaintiff does not offer any argument as to how Defendant fits into the Phase I, II or III Distributions.

Defendant argues that its claim, to the extent that it becomes allowed, cannot be classified as an Allowed Deferred Claim under section 2.7. Defendant agrees with Plaintiff that section 2.7 requires the existence of one of two conditions in order to create an Allowed Deferred Claim: (1) the claim holder agrees to deferred distribution or (2) the claim is "Allowed subse-

quent to the Effective Date." (*Id.* at § 2.7.) However, Defendant also reads section 2.7 as requiring that a claim be payable through the Subsequent Distributions. But the Subsequent Distributions only provide for distribution to three groups of creditors: (1) "Holders of Allowed Deferred Claims that have agreed to a deferred Distribution," (2) a group of Korean Banks who hold by far the largest administrative claims against the Debtors, and (3) holders of a certain type of general unsecured claim. (*Id.* at §§ 2.110, 2.111, 2.112.) Because Defendant does not fit into any of those three groups, and because the Subsequent Distributions do not otherwise provide for distribution to Defendant, Defendant argues that it does not have an Allowed Deferred Claim under section 2.7.

Defendant similarly claims that section 6.12 cannot apply to its claim because it provides for payment of the claim through the Phase I, II and III Distributions, "whichever is applicable." (*Id.* at § 6.12.) None of the phase distributions are applicable, Defendant argues, because they make no provision for distribution to the holders of claims that become allowed later.

Defendant's interpretation highlights a troublesome contradiction between sections 2.7 and 6.12 and sections 2.110, 2.111 and 2.112, but it does not resolve this contradiction. If distribution to creditors whose claims become allowed after the Effective Date or after the Initial Distribution Date was not intended to occur through the Phase I, II and III Distributions, why did the drafters of the Plan explicitly include the claims of these creditors in sections 2.7 and 6.12?

Additionally, Defendant points out that applying the Plan to provide Defendant with anything less than full payment on its claim, to the extent that it becomes allowed, would be contrary to

§ 1129(a)(9)(A), which provides that, absent an agreement providing for different treatment, a plan cannot be confirmed unless it provides for cash payment as of the effective date equal to the allowed amount of any administrative claim.[3] When multiple interpretations of a plan are possible, courts should favor an interpretation that is consistent with the Bankruptcy Code over one that contravenes it. *In re Monclova Care Ctr., Inc.,* 254 B.R. 167, 173 (Bankr.N.D.Ohio 2000) ("[A]mbiguities contained in a Chapter 11 plan are interpreted so as to comport with, rather than contravene, express provisions of the Bankruptcy Code."); *In re Jankins,* 184 B.R. 488, 492 (Bankr.E.D.Va.1995) ("[A]n ambiguous plan provision should be construed in such a way that it comports with rather than contravenes an express provision of the Bankruptcy Code.").

Defendant argues that a less troublesome application of the Plan would be to treat Defendant's claim as an "Allowed" "Administrative Claim," under the definitions given in sections 2.2 and 2.5.[4] If Defendant's claim is an Allowed Administrative Claim, and not an Allowed Deferred Claim, then payment of the claim would be governed by section 4.1 of the Plan, which provides:

Each holder of an Allowed Administrative Claim including, without limitation, a Professional Claim (except any holder that agrees to different treatment or all Holders of Allowed Deferred Claims) shall receive the Allowed Amount of its Administrative Claim from the Trustee on or as soon as practicable after the Effective Date.

(Doc. # 2601, § 4.1.) Pursuant to this section, Defendant requests that the Court order that Plaintiff pay Defendant's claim in full, to the extent that it becomes allowed, as soon as practicable. This application of the Plan would work fine, if not for the parenthetical in section 4.1 that links back to the section 2.7 definition of "Allowed Deferred Claim." As noted above, the Plan creates considerable confusion as to whether Defendant's claim should be classed as an Allowed Deferred Claim.

A third possible application of the Plan would be to interpret section 6.12 as establishing *when* Defendant's claim should be paid, rather than *how.* Where section 6.12 states that Plaintiff must pay claims that become Allowed after the Initial Distribution date "pursuant to either the Phase I

---

3. Section 1129(a)(9)(A) provides
(a) The court shall confirm a plan only if all of the following requirements are met: ...
(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

4. The definition of the term "Administrative Claim" provided in section 2.2 of the Plan is quoted in note 2 *supra.* Section 2.5 of the Plan defines the term "Allowed" or "Allowed Claim" as

A Claim, including an Administrative Claim, against the Debtors which, as of the Effective Date, ... which is set forth in a proper and timely filed proof of claim ... as to which (a) no party in interest entitled to do so has filed an Objective to such Claim or a request that it be estimated by the Effective Date; or (b) if such a party in interest has filed an Objection to such Claim or request for estimation, the Claim is allowed by a Final Order of the Court.... (Doc. # 2601, § 2.5.) The parties agree that Defendant filed a timely proof of claim and therefore Defendant's claim can become "Allowed" pursuant to this definition to the extent that it is allowed by a final order of this Court.

Distributions, Phase II Distributions or Phase III Distributions, whichever is applicable," it may be providing that such claims should be paid at the time of the next phase of distributions. (*Id.* at § 6.12.) This interpretation would also bring section 6.12 into compliance with the requirement of § 1129(a)(9)(A) that all administrative claims be paid in full. However, this interpretation does not resolve the conflict between section 2.7 and sections 1.110, 1.111 and 1.112. Because none of the above interpretations of the Plan serve to fully resolve the contradictions in the Plan, this Court finds that the Plan is ambiguous.[5]

## II. Moving Past Plan Interpretation

As none of the above interpretations of the Plan are entirely satisfactory, it is a relief to note that it is unnecessary to determine which interpretation of the Plan is most correct in order to resolve this dispute.[6] There are several ways to resolve this case without untangling the Plan's inconsistencies: First, through the language of the Court's Findings of Fact, Conclusions of Law and Order Confirming Debtors' Third Amended Plan of Liquidation (the "Confirmation Order"); second, through the doctrine of judicial estoppel; third, by reference to extrinsic evidence of the Debtors' intent while drafting the Plan; and fourth, through analogy to similar reported cases.

### A. The Confirmation Order

 The correct treatment of Defendant's claim is provided for in the Confirmation Order that this Court issued on October 22, 2003, which states the following in relation to allowed administrative claims:

> Except to the extent that the holder of a particular Claim agrees to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims specified in section 507(a)(1) of the Bankruptcy Code shall be paid in full on or as soon as practicable after the Effective Date in accordance with the provisions of Section 1129(a)(9)(A) of the Bankruptcy Code.... [T]he plan satisfies Section 1129(a)(9) of the Bankruptcy Code.

(Doc. # 2605, p. 9.) This provision of the Confirmation Order clearly contradicts with Plaintiff's interpretation of the Plan under which Plaintiff would only pay Defendant a small fraction of whatever portion of Defendant's claim is eventually allowed.

---

**5.** The ambiguities of the Plan are not limited to the sections already discussed. Another ambiguity arises from the Plan's use of the term "Initial Distribution Date." Section 2.90 defines "Initial Distribution Date" as "the date on which there are sufficient funds available to fund the Initial Distribution and Initial Korean Distribution." (Doc. # 2601, § 2.90.) "Initial Distribution" is defined as

payment to a Holder of (a) an Allowed Secured Claim that has not agreed to deferred payments, (b) an Allowed Administrative claim that has not agreed to deferred payments, (c) a Priority Non–Tax Claim that has not agreed to deferred payments, and (d) Professional Claims.

(*Id.* at § 2.88.) While section 2.90 seems to anticipate a single Initial Distribution, section 2.88 does not foreclose the possibility that there could be several Initial Distributions. In oral argument, at a March 13, 2007 hearing, Defendant suggested that section 2.88 may be providing that each creditor could have its own Initial Distribution and its own Initial Distribution Date. If such is the case, section 6.12 would not apply to Defendant because Defendant's claim will be allowed, assuming that it is, before any Initial Distribution to Defendant has occurred.

**6.** I note that Plaintiff's counsel did not represent the Debtors in any matters related to the chapter 11 process, including the drafting of the Plan and related documents.

A plan of reorganization has no effect without a court's confirmation. When the plan and the confirmation order contradict, "the confirmation order prevails." *Guardian S & L Ass'n v. Arbors Assocs. Ltd. Pshp. (In re Arbors Assocs. Ltd. Pshp.)*, No. 97-2099, 1999 WL 17649, *4, 1999 U.S.App. LEXIS 162, *11 (6th Cir. Jan. 4, 1999); *see also In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 367 (E.D.Pa.1996) ("Upon confirmation of the Plan, the bankruptcy court signed the Confirmation Order which supersedes the Plan.... Even if the court were to find that the Plan allowed for post-confirmation withdrawal, the controlling language of the Confirmation Order clearly does not."); *Reisher v. IRS (In re Reisher)*, 149 B.R. 372, 374 (Bankr.M.D.Pa.1992) (stating that where the plan and the confirmation order contradict, "[t]he language of the order must prevail over the language of the plan"). Therefore, the Court finds that the Confirmation Order controls and accordingly Plaintiff should pay Defendant's claim in full as soon as practicable after its allowance.

### B. Judicial Estoppel

The Confirmation Order is not the only document that states that the Plan conforms with § 1129(a)(9)(A). The Debtors stated the following to the Court in their Memorandum of Law in Support of Confirmation of the Third Amended Plan of Liquidation ("Memorandum of Law"):

> Section 1129(a)(9) of the Bankruptcy Code contains a number of requirements concerning the payment of priority claims. 11 U.S.C. § 1129(a)(9). The Plan meets the requirements of all three subsections of Section 1129(a)(9) of the Bankruptcy Code by providing for payment in full of Allowed Administrative Claims, unless the Holder of an Administrative Claim has agreed to deferred treatment, as soon as practicable after the Effective Date or the date such Claim becomes allowed, whichever is later. *See* Article IV, Section 4.1 of the Plan.

(Doc. # 2592, p. 22.) This statement directly contradicts with Plaintiff's argument in this proceeding that the Plan does not require Plaintiff to pay Defendant's claim in full assuming it becomes allowed. "Judicial estoppel is 'a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding.'" *Yong Wong Park v. United States AG*, 472 F.3d 66, 73 (3d Cir.2006) (quoting *In re Chambers Dev. Co., Inc.*, 148 F.3d 214, 229 (3d Cir.1998)). The Debtors' assertion that the Plan conforms with § 1129(a)(9)(A) allowed the Debtors to get the Plan confirmed. Plaintiff cannot now change the argument to its own advantage to avoid paying Defendant in full.

### C. Extrinsic Evidence of the Debtors' Intent

As noted above, several provisions of the Plan that address how Defendant's claim should be treated, including sections 2.7, 2.110, 2.111, 2.112 and 6.12, elude interpretation because they are ambiguous. Under Delaware law, a court may look to extrinsic evidence of the parties' intent when the language of a contract is ambiguous. *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del.1992) (looking elsewhere to determine contracting parties' intent where it could not be gleaned from the language of the contract); *Eagle Indus., Inc. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 (Del. 1997) (stating that when contract terms are ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions").

In this case there is substantial evidence beyond the four corners of the Plan document that the Debtors and this Court intended the Plan to conform with § 1129(a)(9)(A). As noted above, this Court found in the Confirmation Order that the Plan provides for full payment of administrative claims except where the holders of those claims have agreed to different treatment. (Doc. # 2605, p. 9.) Also noted above, the Debtors represented to the Court in their Memorandum of Law that the Plan provides "for payment in full of Allowed Administrative Claims, unless the Holder of an Administrative Claim has agreed to deferred treatment." (Doc. # 2592, p. 22.) Additionally, the Debtors' Second Amended Disclosure Statement ("Disclosure Statement") provides: "Each Holder of an Allowed Administrative Claim (except any Holder that agrees to different treatment) will receive the Allowed Amount of its Administrative Claim from the Trustee on or as soon as practicable after the Effective Date." (Doc. # 2446, p. 28.) On the next page, the Disclosure Statement reaffirms that the Plan provides for full payment to Defendant, stating that "[t]he Plan ... provides for payment in full on or after the Effective Date to Holders of ... Allowed Administrative Claims that have not otherwise agreed to deferred payments." (*Id.* at p. 29.)

■ Although the language of the Plan leaves some doubt as to how Defendant's claim should be treated, the Confirmation Order, Memorandum of Law and the Disclosure Statement clearly provide for full payment of Defendant's claim if it is found to be an administrative claim. Using these documents as evidence of the Debtors' intent, it is clear that the Plan should be interpreted as ordering full payment of Defendant's claim, if an when it becomes

allowed. This ruling is consistent with the rule of construction that provides that ambiguities should be construed against the party that drafted the contract.[7] *In re NVF Co.,* 309 B.R. 698 (Bankr.D.Del.2004); *Schellhorn v. Farmers Sav. Bank (In re Schellhorn),* 280 B.R. 847, 853 (Bankr. N.D.Iowa 2002).

### D. Relevant Case Law

■ Plaintiff has argued that it does not matter that the Plan fails to meet the requirement of § 1129(a)(9)(A) that administrative claims be paid in full because the Court has already confirmed the Plan. Since conformity with applicable provisions of the Bankruptcy Code is a prerequisite for confirmation, (*See* § 1129(a)(1)), a confirmation order constitutes a ruling that a plan conforms to the Bankruptcy Code. *Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee),* 193 F.3d 1083, 1087 (9th Cir.1999) ("[C]onfirmation orders are final orders that are given preclusive effect."). If an inconsistency between a plan and the Bankruptcy Code is later found, the confirmation order can bar litigation of the issue under the doctrine of res judicata. *See Andersen v. UNIPAC–NEBHELP (In re Andersen),* 179 F.3d 1253, 1258 (10th Cir. 1999) ("Absent timely appeal, the confirmed plan is res judicata and its terms are not subject to collateral attack.").

■ However, courts have found that if a plan takes away the rights of a creditor through general, nonspecific language, confirmation does not preclude future action by the creditor under the doctrine of res judicata. *See Miller v. United States (In re Miller),* 253 B.R. 455 (Bankr. N.D.Cal.2000); *In re Jankins,* 184 B.R. 488. In *Miller* the holder of a priority tax claim failed to object to the debtor's plan

---

7. Although it was the Debtors' counsel, rather than Plaintiff's counsel, that drafted the Plan, ambiguities should still be construed against Plaintiff as the Debtors' successor.

of reorganization that discharged the claim in contradiction with the § 1129(a)(9)(C) requirement that priority tax claims be paid in full. 253 B.R. 455. When the claim holder sought full payment, the debtor argued that the confirmation order barred the claim holder from seeking any remedy under the doctrine of res judicata. The court refused to give effect to the plan provision that called for discharge of the claim because "[i]t does not state that section 1141(d)(2) is not to apply. Nor does it state expressly that confirmation of the plan will discharge debts that would otherwise be nondischargeable." *Id.* at 460.

*Jankins* similarly involved a priority tax claim holder who failed to object to a plan of reorganization that impaired its rights under § 1129(a)(9)(C). 184 B.R. 488. The debtors argued that the plan provided that they did not have to pay post-petition interest to the priority tax claim holder. The court accepted that the debtor's subjective intent in writing the plan was to not pay post-petition interest. *Id.* at 492. However, because the language of the plan was ambiguous, the court opted to interpret the plan as requiring the payment of post-petition interest to make the plan consistent with § 1129(a)(9)(C). *Id.* at 493.

Applying the rulings of *Miller* and *Jankins* to the case at hand, no effect can be given to any Plan provisions that may apply to give Defendant anything less than the full payment required by § 1129(a)(9)(A). The Plan contains no language that states that § 1129(a)(9)(A) should not apply, nor does it "state expressly that confirmation of the plan will discharge debts that would otherwise be nondischargeable." *In re Miller,* 253 B.R. at 460.

At the root of the rulings in *Miller* and *Jankins* is the simple principle that it would be unfair to deprive creditors of their statutory rights to full payment under the Bankruptcy Code, where plan provisions do not explicitly take those rights away. If a plan explicitly puts a creditor on notice that it is in danger of losing its rights and the creditor fails to act to protect its rights, then rigid application of the plan seems justified. However, where it is more difficult or impossible for the creditor to realize that the Plan threatens its statutory rights, it is inequitable to punish the creditor for failing to object.

In the case at hand, Defendant would have had little or no reason at the time of the confirmation of the Plan to suspect that its statutory rights were in danger. In the agenda for the October 22, 2003 confirmation hearing, the Debtors stated that they would be "going forward" with respect to their Objection. (Doc. # 2597.) Defendant came to the confirmation hearing accompanied by a witness, ready to litigate the merits of its Claim, with no reason to expect that the Objection would not be resolved before the Effective Date.[8] (Oct. 22, 2003 Hearing Transcript, Adv. Doc. # 40, Ex. E, p. 56, lines 15–16.) At the hearing, the Debtors stated that they were not ready to discuss the merits of Defendant's claim, but urged the Court to go forward with the Plan confirmation, arguing that there was sufficient money available under the Plan to pay Defendant's claim in full if it were later allowed. (*Id.* at p. 91, line 21—p. 92 line 11.) Debtors were at least partially to blame for the fact that this dispute was never resolved prior to the Effective Date. During the time between the confirmation date and the Effective Date, Debtors settled with all

8. In fact it was not even clear at the confirmation hearing when the Effective Date would occur, given that the Plan provision defining the Effective Date contains multiple contingencies. (*See* Doc. # 2601, § 2.59.)

the holders of administrative claims who had not agreed to deferred distribution, but not Defendant. Therefore, Defendant should not be punished for failing to object to the Plan because, at the time of the confirmation, Defendant had little or no reason to suspect that sections 2.7 and 6.12, could end up taking away Defendant's rights under § 1129(a)(9)(A).

## CONCLUSION

Based on the reasoning outlined above, Defendant's motion for partial summary judgment is granted. If Defendant's claim becomes allowed in part or in whole, Plaintiff will be required to pay the claim in full as soon as practicable.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, Defendant's motion (Adv. Doc. # 38) for partial summary judgment is **GRANTED**.